U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2019 NOV 20 PM 1:35**

CLERK

BY_____*law*_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

SUZANNE D., )
)
Plaintiff, )
)
v. ) Case No. 2:17-cv-00249
)
NANCY A. BERRYHILL, )
Acting Commissioner of )
Social Security, )
)
Defendant. )

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE COMMISSIONER'S DECISION AND GRANTING THE COMMISSIONER'S MOTION TO AFFIRM

(Docs. 6 & 7)

Plaintiff Suzanne Dodge is a claimant for Disability Insurance Benefits ("DIB") benefits under the Social Security Act ("SSA"). She brings this action pursuant to 42 U.S.C. § 405(g) and moves to reverse the decision of the Social Security Commissioner (the "Commissioner") that she is not disabled.[1] The Commissioner moves to affirm. The court took the pending motions under advisement on August 3, 2018.

Plaintiff asserts that Administrative Law Judge ("ALJ") Dory Sutker's finding that she is able to function in a typical office environment is not supported by substantial evidence on two grounds: (1) the ALJ erred in considering the medical opinions of Steven Golub, M.D., as substantial evidence of the severity of Plaintiff's condition; and

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's "age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

(2) the ALJ failed to provide good reasons for the weight assigned to the opinions of Plaintiff's treating physicians, Tina D'Amato, D.O. and Raymond Psonak, D.O. Plaintiff asks the court to find her disabled and remand for the calculation of benefits. The Commissioner contends that Plaintiff was found not to be disabled with regard to an earlier period closer in time to her environmental exposure and is not disabled for this later time period as well.

Plaintiff is represented by Craig A. Jarvis, Esq. The Commissioner is represented by Special Assistant United States Attorney Catharine L. Zurbrugg.

## I. Procedural History.

On February 19, 2015, Plaintiff filed an application for DIB, alleging a disability onset date of September 28, 2010.[2] Her application was denied initially on June 3, 2015 and upon reconsideration on September 24, 2015. Plaintiff filed a timely written request for a hearing. On March 21, 2017, ALJ Sutker presided over Plaintiff's hearing from Manchester, New Hampshire. Plaintiff appeared in Burlington, Vermont and testified via video. Dr. Golub, an impartial medical expert, and Vocational Expert ("VE") James T. Parker also appeared and testified. At the hearing, Plaintiff amended her disability onset date to June 29, 2013 due to the decision of an ALJ in a previous claim, which adjudicated the period ending June 28, 2013.

On June 1, 2017, ALJ Sutker issued a written decision finding Plaintiff not disabled. Thereafter, Plaintiff sought review of ALJ Sutker's decision by the Social Security Administration's Office of Disability Adjudication and Review Appeals Council, which denied her request for review on October 10, 2017. ALJ Sutker's determination thus stands as the Commissioner's final decision.

---

[2] Plaintiff also filed a prior application for DIB in May 2011, alleging a disability onset of July 24, 2010. That application was denied in a decision issued on June 28, 2013 which Plaintiff did not appeal.

2

## II.    Factual Background.

Plaintiff was born on March 31, 1972. She has a bachelor's degree in biology and has worked as a biological technician and biologist. She currently runs a small coffee roasting business at her home to which she typically devotes two hours a week.

Because Plaintiff does not challenge the ALJ's conclusions regarding her degenerative joint disease (knee), her adjustment disorder, and her Attention Deficit Hyperactivity Disorder ("ADHD"), the court does not address at length those impairments and their impact on Plaintiff's residual functional capacity ("RFC"). At issue in this appeal is solely the ALJ's determination that Plaintiff's Multiple Chemical Sensitivities ("MCS") do not render her disabled. Although some of the evidence of this condition predates the relevant period, it provides a useful context for analyzing Plaintiff's claims.

### A.    Plaintiff's Medical History.

In April 2009, Plaintiff began working for an environmental consulting firm as a field researcher studying the impact of wind turbines on bats and birds. In June 2009, she developed flu-like symptoms after walking through farmland in the course of her employment. On July 28, 2009, Michael Lax, M.D., M.P.H., evaluated Plaintiff for the New York Workers' Compensation Board, finding that Plaintiff reported her symptoms had worsened and she "experienced some nose burning, fatigue, and weakness" when she inhaled "a pesticide or herbicide that was directly sprayed in her car" by a farmer treating his field. *Id.* After Plaintiff "suffered another direct inhalation of visible pesticide/herbicide [she] noticed [an] increase in her symptoms including loss of coordination, memory loss, muscle twitching, dizziness, confusion, nausea, and irritability." *Id.* When her symptoms first arose, Plaintiff visited the emergency room several times. Although she was not admitted to the hospital, she asserted she was "bedridden" for approximately a month. (AR 104.)

Plaintiff stopped work on July 10, 2009 and reported that her symptoms began to significantly improve. She no longer had nausea or dizziness; her muscle twitching was almost completely resolved; her muscle weakness was improving; she was not as

3

fatigued; and her central nervous system functioning was greatly improved. Dr. Lax diagnosed Plaintiff with pesticide overexposure. On October 9, 2009, he wrote to Plaintiff to provide information about specific herbicides that might have triggered her symptoms. His opinion that Plaintiff had been exposed to pesticides remained unchanged and he stated that the only treatment was the elimination of pesticide exposure.

On February 17, 2010, Plaintiff returned to Dr. Lax and described symptoms of fatigue, disorientation, nausea, increased heart rate, and flu-like symptoms. She reported feeling "dragged down and ill" (AR 445) as well as experiencing headaches and burning eyes when she was around her propane stove and new furnace. Dr. Lax noted that Plaintiff reported "similar symptoms when she goes into Home Depot or goes to the hunting and fishing show. Her symptoms persist for [twenty to thirty] minutes after she leaves the exposure area." *Id.* Dr. Lax diagnosed "[p]esticide over[-]exposure" and MCS. *Id.*

In April 2010, Dr. Lax noted that Plaintiff continued to experience significant symptoms, although she had returned to work in March and had some improvement in her MCS. On July 6, 2010, he recorded that Plaintiff was working at home because she was unable to tolerate being in other settings such as hotel rooms.

On September 22, 2010, Plaintiff told Dr. Lax that she had recently been diagnosed with adrenal insufficiency, had been prescribed prednisone for ten to fourteen days, and had "lost some of her fatigue and tiredness." (AR 447.) At the time, Plaintiff was not working. She advised that exposure to fumes from kerosene, diesel, propane, or perfume exacerbated her symptoms, and that exposure to cleaners caused her an instant headache, lightheadedness, and tiredness. She also experienced postnasal drainage, problems with memory and concentration, confusion, hoarseness, and tightness in her chest. She felt aching in her joints, which radiated to her muscles and mostly occurred when she was tired or cold. Following a telephone consultation in December 2010, Dr. Lax wrote:

> She has a lot of fatigue. She wakes up tired, but her energy level increases
> by around noon. She was taking prednisone for [two and a half] months,

4

but is now off of it. She becomes symptomatic with exposures such as getting headaches when she is exposed to burning candles. She also gets headaches[s] with pressure in the head and sinuses and generally feel[s] sick when she is around [] exhaust fumes. She gets body aches, tiredness, and irritability when she goes into the grocery store. She generally avoids exposures by grocery shopping only once a week and she goes only to one store at a time. When she has an exposure, her symptoms may last for a day or two. She did get an air purifier for her vehicles. She is unable to drink coffee or alcohol because it causes muscle aches and tiredness. She feels as though she has the flu and she also has tremors[.]

(AR 448.)

In February 2011, Dr. Lax conducted a telephone interview with Plaintiff for which he recorded the following:

[Plaintiff] had a Workers' Compensation hearing and had to drive for [eleven] hours. She developed a lot of fatigue and had to lie down a lot. She also had chest tightness, headache, lost her voice, head congestion, tremors of the hand and arm, and trouble with word finding, communicating and irritability. She is still recovering from the drive. She continues to have many of these symptoms on a regular basis. If she is not exposed, she feels pretty good. She limits her activities. She only goes to the grocery store once a week for [twenty to thirty] minutes. She tries to do outdoor activities and walks a couple of miles per day. She does not go downtown or into any big stores.

(AR 449.) Dr. Lax conducted another phone consultation with Plaintiff on May 10, 2011 in which they discussed Plaintiff's MCS symptoms.

At an August 30, 2011 appointment with Dr. Lax, Plaintiff reported that she had been "quite careful about where she goes and what she has potentially been exposed to[.]" (AR 452.) Dr. Lax noted that, as a result, Plaintiff's MCS-related symptoms had decreased in frequency, but there had been occasions when she had been unexpectedly exposed and her symptoms had reoccurred.

On December 12, 2011, Plaintiff reported to Dr. Lax that she was doing relatively well as she was spending "almost all" of her time at home, with the exception of occasional trips to the store. (AR 451.) However, Plaintiff noted that the oil furnace in her rental house had been turned on and the odor of the furnace caused her headaches, burning eyes, and an itchy throat.

5

In addition to Dr. Lax, Plaintiff began seeing Raymond Psonak, D.O., for treatment of her MCS from November 2010 to May 2011. At an initial visit on November 4, 2010, Dr. Psonak noted that Plaintiff reported she had "developed sensitivities to many various chemicals including but not limited to chlorine, gasoline and diesel exhaust, ammonia, fragrances from soaps, insect sprays, paints, hair sprays, and tobacco smoke." (AR 782.) On December 28, 2010, Plaintiff discussed her continued reactions to certain chemicals with Dr. Psonak, and he recommended the use of Vitamin C and tri-salts to treat "acute reactions." (AR 788.) In March 2011, Plaintiff informed Dr. Psonak that she had acquired a Labrador puppy and was walking twice a day, and he recommended she try tri-salts or baking soda to treat reactions to chemicals.[3] Plaintiff returned to Dr. Psonak in May 2011 and stated that her fatigue had improved somewhat, but she had recently suffered a chemical reaction to an unspecified substance. She was pregnant with a due date of October 27, 2011 and advised that her recent blood cortisol tests were normal, she was walking approximately two miles per day, and was planning to volunteer for a conservation/research project off the coast of Maine.

On June 7, 2011, Dr. Psonak wrote a letter in which he noted that he had treated Plaintiff since November 2010 for medical conditions resulting from her exposure to herbicides or insecticides in the summer of 2009. These conditions included: adrenal insufficiency; fatigue; an endocrine system disorder; aluminum toxicity; and sensitivities to various chemicals such as fragrances, chlorine, tobacco smoke, ammonia, exhaust fumes, and numerous other volatile organic compounds. He stated:

If I were to put a percentage on her disability, it would vary from 20% to 90%. If she is in a clean environment such as her home where she is able to control exposures, she most likely could function up to 90%. However, in a normal workplace environment which has unpredictable exposures from such items as cleaning fluids, dust and molds from air circulation, fragrances from products used by other people, new furniture and

---

[3] Dr. Psonak's treatment notes appear to document that Plaintiff had an appointment on March 10, 2010. (AR 787). However, Dr. Psonak later wrote that he began treating Plaintiff in November 2010. Additionally, the notes for the March 10, 2010 appointment reference the fact that Plaintiff was pregnant, which occurred in 2011. It therefore appears that this appointment was on March 10, 2011, and the treatment notes contain a typographical error.

6

carpeting[,] outgas[,] etc. she may only be able to function at 20%, or worse. For example, a cigarette smoker who has smoked a few hours ago can still outgas tobacco products which can make her sick for 2-3 days[.]

(AR 781.)

On May 16, 2012, Dr. Psonak reiterated in a letter that Plaintiff suffered from MCS and several other conditions as a result of her exposure to herbicides or pesticides during the summer of 2009. He explained:

MCS is a chronic condition in which compounding exposures increase the severity of the reaction, causing chronic inflammation of various body systems. Disabling inflammation occurs in the following systems for [Plaintiff]: Respiratory, Nervous, Circulatory, Endocrine, Digestive and Immune. Exposures also cause physical symptoms such as loss of coordination and balance, muscle tremors, blurred vision, dizziness, and nausea. Finding a suitable work environment has been extremely difficult for [Plaintiff] due to unavoidable exposures during everyday activities such as grocery shopping, [Volatile Organic Compound] off-gassing from standard office furniture, common office equipment such as printer/copiers, cleaning supplies, perfumes, etc. make most work settings highly inflammatory and potentially damaging to her health. Therefore, to remain as un-impacted as possible she must avoid areas with any presence of these chemicals.

It is difficult to put a percentage on her disability because it depends on the type of exposure, her recent exposure history that may have heightened her sensitivity level and the condition of the various body systems at the time of the exposure. In my opinion, [Plaintiff] has an average disability level of 75 percent.

(AR 431.)

On May 17, 2012, Plaintiff attended an appointment with endocrinologist Susanne Trost, M.D., to address her previously diagnosed adrenal insufficiency. Plaintiff reported feeling "greatly fatigued" over the previous three months, needing one or two naps during the day to function, and having difficulty exercising. (AR 398.) She stated that she became pregnant easily and delivered a baby by cesarean section six months prior. She denied any pain, heart palpitations, changes in hair or skin, or changes in bowel movements, and noted that she was at her pre-pregnancy weight. A physical examination yielded normal results. Plaintiff returned to Dr. Trost for a follow-up appointment on

August 30, 2012 and reported that her fatigue was "currently ok[ay.]" (AR 401.) She reported no muscle weakness or dizziness and physical examination results remained normal. Dr. Trost's treatment notes do not indicate that Plaintiff reported any chemical exposures in connection with her symptoms.

In July 2012, Plaintiff presented to Copley Hospital with a right hamstring strain, where she was treated by Vincent J. Faraci, Certified Athletic Trainer, who noted that Plaintiff had a history of two right knee injuries, in 1996 and 2000 respectively, both of which resulted in surgeries. Plaintiff reported experiencing pain in her right knee and a pinching sensation when walking. A physical examination revealed a normal gait. Mr. Faraci opined that Plaintiff "has symptoms of mild right knee medial compartment degenerative joint disease. She also displays right patellofemoral syndrome with left [sacroiliac] joint dysfunction and subluxation." (AR 480.)

From August 2013 through 2015, Plaintiff was treated by Tina D'Amato, D.O., for MCS. At an August 28, 2013 appointment, Plaintiff reported that she had a reaction when she entered an old warehouse where her husband worked and "immediately got congested and felt yucky." (AR 411.) She and her family then attended a fair, and she described feeling flushed, dizzy, and nauseated. Plaintiff wondered whether the heat and her menstrual cycle may have played a role in causing her symptoms. A physical and psychiatric examination revealed normal results. In a November 2013 appointment with Dr. D'Amato, Plaintiff reported that "[t]ri[-]salts worked well for her and that she also used grapefruit seed extract" to treat her MCS. (AR 409.) She traveled to a family wedding without major issues and took tri-salts as soon as she realized she had an unspecified chemical exposure. She reported experiencing some symptoms while in San Francisco but believed this was primarily attributable to smog. Physical and psychiatric examination results remained normal.

Plaintiff saw Dr. D'Amato again on July 14, 2014 to receive follow-up care for her MCS and to discuss fertility issues. Plaintiff reported that her MCS was under control because she was not frequently leaving her house. When she did have exposures, they were generally minimal and she used tri-salts to help limit her reactions. Her physical

8

examination was normal. At an October 28, 2014 appointment, Dr. D'Amato noted that Plaintiff was "doing well" and that her house was the safest place for her to be. (AR 405.) Plaintiff went to the grocery store once per week, was taking an adrenal support formula, and used tri-salts if she had a chemical exposure. Physical and psychiatric examinations were normal. Dr. D'Amato stated:

> [Plaintiff] is doing well with her MCS and is not having any big exposures and is still able to get out of her house[.] [I] agree with her reapplying for disability as it is quite difficult for persons with MCS to work outside their homes because of the increased risks of chemical exposure and then the resulting absences during recovery from exposures that can be difficult for employers to understand.

(AR 406.)

On January 27, 2015, Dr. D'Amato noted that use of a nasal spray made Plaintiff irritable, groggy, and unwell, but that she felt better once she stopped using it. Plaintiff avoided chemical triggers as much as she could, but she did not isolate herself. She reported that she "had to leave story time at the library due to another mother's perfume." (AR 479.) She took tri-salts as needed and was not experiencing exposures every day, leading to much shorter reactions. Her physical and psychiatric examinations were normal.

In March 2015, Gabriel Archdeacon, Naturopathic Doctor, wrote a letter stating that in recent years, Plaintiff's health had "seemed pretty manageable." (AR 517.) Although Plaintiff complained of fatigue, she did not attribute it to chemical exposure or complain of symptoms related to chemical exposure. In his letter, Mr. Archdeacon stated that he was not aware of any impairments that would limit Plaintiff's ability to perform activities related to work at that time. Plaintiff had subsequent appointments with Mr. Archdeacon in May, June, July, and October 2015, and in May 2016.[4]

---

[4] In her decision, ALJ Sutker noted that Mr. Archdeacon "is not an acceptable medical source." Her further statement that Mr. Archdeacon's March 17, 2015 letter was written "well after [Plaintiff's] date last insured" (AR 24) is incorrect as Plaintiff's last date insured was June 30, 2015.

9

On December 22, 2015, Dr. D'Amato completed a "Chemical Sensitivity Residual Functional Capacity Questionnaire[.]" (AR 642.) She stated that she started treating Plaintiff on August 28, 2013 and saw her approximately twice per year. She reported that although there were no laboratory results or pulmonary function tests to show MCS, clinical findings including flushed skin, mild distress, nausea, dizziness, difficulty finding words, and balance difficulties supported an MCS diagnosis. Dr. D'Amato noted that Plaintiff's symptoms also included muscle weakness, fatigue, diarrhea, memory loss, confusion, muscle twitching, loss of coordination, nausea, irritability, and nasal irritation, and that Plaintiff first began to experience these symptoms in June 2009.

Dr. D'Amato indicated that Plaintiff suffered from attacks due to chemical sensitivity whenever she was exposed to a chemical trigger, and that those reactions lasted from several hours up to several days. She reported that Plaintiff's reactions varied based on the type and length of exposure, opining that:

A short exposure or exposure to a chemical in a well[-]ventilated area may result only in nasal irritation, flushing, fatigue, and nausea. A more extensive exposure, either through time of exposure or volume of chemical, could result in flu-like symptoms (diarrhea, muscle aches, and nausea/vomiting), fatigue, memory loss, confusion, dizziness, muscle twitching, loss of coordination and irritability.

(AR 646.) She opined that Plaintiff would not be able to work during an MCS attack, but that Plaintiff could avoid attacks by avoiding chemical triggers. Dr. D'Amato indicated that Plaintiff should avoid all exposure to cigarette smoke, perfumes, soldering fluxes, cleaning solvents, fumes, odors, gases, and chemicals, and that she should avoid concentrated exposure to dust. She stated that Plaintiff could not work in an office or school, retail store, factory, warehouse, restaurant, grocery store, outdoors, or on a construction site "without accommodations being made for chemical sensitivity[.]" (AR 643.) Plaintiff's prognosis was good if she could avoid all or most chemical triggers but poor if she was continually exposed. Dr. D'Amato asserted that Plaintiff would miss four or more days of work per month in a "common" workplace. (AR 644.)

Plaintiff was seen by Nurse Practitioner Angela Winchell on August 31, 2016 for complaints of fatigue that began a week earlier with the onset of her menstrual period. Plaintiff did not report any recent chemical exposures during this appointment. On September 30, 2016, Plaintiff reported to Physician's Assistant ("PA") Monique Karthaus that she had experienced fatigue and arthralgia[5] over the past five days. Her symptoms were allegedly worse at night. She did not state she had been exposed to chemicals. Plaintiff also complained of joint swelling on her left fourth finger although a physical examination showed no edema and yielded a full range of motion. The remainder of Plaintiff's physical examination results were normal.

At an October 14, 2016 appointment with Stephanie Wawrzyniak, N.D., Plaintiff complained of skin tingling and aches on her left side. Plaintiff noted that her primary care provider thought that she might be peri-menopausal. She did not report any recent chemical exposures.

**B.    State Consultants' Assessments.**

On July 28, 2011, Plaintiff met with Robert Hayes, D.O., for a physical assessment. He opined Plaintiff had environmental limitations and that "due to multiple chemical sensitivities [Plaintiff] should avoid known allergens." (AR 128.) On December 13, 2011, state consultant Carl Runge, M.D., adopted Dr. Hayes's assessment that Plaintiff should avoid known allergens.

On April 16, 2015, Joanne P. Hayden, Licensed Psychologist-Master, performed a consultative examination of Plaintiff. During the examination, Plaintiff reported that she had been diagnosed with ADHD in college. She described various trials of antidepressants with no benefits and noted that she took Adderall until 2010 when she "could no longer tolerate it." (AR 519.) With regard to her activities of daily living, Plaintiff stated that she grocery shopped on Monday mornings when there were fewer people and less likelihood of exposure, and she completed her shopping within thirty minutes. She dropped her son off at daycare on Tuesdays and Thursdays when she was

---

[5] Arthralgia is "[p]ain in a joint." *Arthralgia*, Stedman's Medical Dictionary 159 (28th ed. 2006).

able to do so. She could drive a car if she closed the air vents, but could cook only a limited variety of meals due to her need to avoid exhaust from her stove. She was restricted from public group events and tended to do better in nature.

Ms. Hayden conducted a mental status examination, noting that Plaintiff was well-groomed, articulate, and reserved. Plaintiff's primary complaint was poor concentration, but Ms. Hayden found that she was alert, attentive, and on task during the mini-mental status examination for which she achieved a perfect score. Ms. Hayden's "diagnostic impressions" of Plaintiff included "ADHD," "adjustment disorder," and "occupational problems." (AR 521.)

Ms. Hayden concluded that Plaintiff exhibited little to no cognitive impairment and she did not meet the diagnostic criteria for a primary mental health diagnosis. She observed that Plaintiff "seem[ed] to have legitimate stressors including the higher costs of alternative care and treatment and no longer earning her own salary." *Id.*

## C. Testimony at the March 21, 2017 Hearing Before ALJ Sutker.

At the March 21, 2017 hearing before ALJ Sutker, Plaintiff testified that in 2009, she was exposed to pesticide spray while working as a biologist conducting post-construction wind farm surveys. She stated that she immediately experienced a headache and that two day later she was "bedridden for a month with severe tremors and headaches[.]" (AR 96.) Although she "had several [emergency room] visits" during that period, Plaintiff was not admitted to the hospital. (AR 104-05.) She returned to work in the fall of 2009, but her health worsened and her symptoms prevented her from performing her job duties. She stated that she has continued to experience the following physical symptoms since 2009: headaches, vertigo, dizziness, mucus production, tremors, heart palpitations, muscle weakness, digestive issues, vision issues, and severe tiredness. Her mental symptoms included "[m]ental fogginess[,]" difficulty word-finding, and difficulty "putting together full thoughts." (AR 95, 97.) She noted that her symptoms "come[] and go" depending on her exposure to chemicals. (AR 97.)

Plaintiff testified that she lives with her husband and their five-year-old son. She has a valid driver's license and is able to drive without restrictions. She drives her son to

school almost every day, attends doctor's appointments, and tries to go to the grocery store once per week at times when the store is less likely to be busy. She can socialize on occasion outdoors and pick up her son from playdates, but cannot go inside other people's homes. Plaintiff stated that she could not work outside her home, but described the small coffee-roasting business she had conducted out of her home for the previous two years. She described experiencing severe chemical reactions outside of her home which forced her to stay in bed for several days to a week. She stated that she could not work in an office environment because she would be in contact with people who used shampoo, perfume, and cologne, as well as the odors associated with carpets, paint, computers, printers, and copy machines. Plaintiff noted that she initially received treatment from Dr. Lax for MCS, and then switched to Dr. D'Amato. Plaintiff explained that the primary treatment for her condition was avoiding exposure to petroleum, burning candles, deodorizers, and off-gassing from paint, carpets, plastics, computers, or printers.

On her "very best day[s]," Plaintiff testified that she is able to take her son to school, take the dogs out for a walk, rest, make lunch, attend a doctor's appointment, and pick her son up from school. (AR 103.) Even then, she must rest for about four hours during the day. On a bad day, her husband must do everything because she spends most of her day in bed. She estimated that she has two to three "really good" days per month and three to four "worst" days. *Id.* She explained that the longer she goes without an exposure, the better she feels, but that the symptoms are never completely gone. If she never left her house, she thought that all days would be at an average to best level.

Medical expert Steven Golub, M.D., who is Board-certified in Internal Medicine, also testified at the hearing. He had never examined or treated Plaintiff, but rendered opinions based upon his assessment of her medical record. Dr. Golub opined that Plaintiff had medically determinable impairments of MCS, degenerative disc disease in her knee, and hypothyroidism, but that her impairments did not meet or equal a Listing. He found that Plaintiff had limitations of lifting ten pounds frequently and fifteen pounds occasionally and could stand or walk for three to four hours with no significant restrictions with regard to sitting. She could not climb ladders or scaffolding; could

13

occasionally kneel and crawl; should not work around unprotected heights; and should avoid extreme cold or heat, as well as fumes and pulmonary irritants. Based on the record, Dr. Golub disagreed with Dr. D'Amato's assessment that claimant would miss more than four days of work per month due to chemical sensitivity.

ALJ Sutker asked Dr. Golub several questions regarding the types of fumes or irritants to which Plaintiff should limit exposure:

> Q.     And can you get more specific than that? When you say avoid fumes, I mean totally?

> A.     Well, it's hard to say, Your Honor, because I don't think it's really very well known as to what her specific sensitivity is caused by. I know it's an herbicide, but I don't think it was really pinned down specifically, so I'd have to say anything having to do with outdoor herbicidal treatment, anything that was being spread on the ground she should need to avoid.

> Q.     All right. I'm just trying to get some sense of, you know—you know, clearly, she's not living in a total bubble, so—

> A.     Right. I don't—well, let me put it this way, Your Honor. If a gardener is tending to her—outside of her home, and they were going to be spreading stuff on the floor to kill insects or fertilize, I think that should be avoided, but in an indoor—indoors, I don't think it would be much of an issue.

> Q.     All right. . . . Dr. D'Amato indicates no restrictions with regard to exposure to temperature extremes, high humidity or wetness, but would have to totally avoid cigarette smoke, perfumes, soldering fluxes, solvents, cleaners, fumes, odors, gases, not dust, chemicals. So, tell me why your opinion differs . . . from that.[6]

> A.     Well, honestly, I didn't consider solders and things of that nature. I mean cigarette smoke, as far as I know, is unrelated to herbicidal exposure, but you know, anyone with this history that's exposed to something in the air that's not commonly—if she's not commonly exposed to it can cause a reaction. It's just—there's no way for me to know specifically what that might be. I mean that sounds like a pretty exclusive list, so I certainly couldn't argue with it.

---

[6] The hearing transcript attributes this statement to Dr. Golub, but its content suggests that the speaker was actually the ALJ.

Q. All right. . . . Dr. D'Amato opines that the Claimant would miss more than four days of work a month due to chemical sensitivity. Would you agree with that or not based upon the record?

A. Based upon the record, I have no reason to go along with that, at least the more recent records.

(AR 109-11.) Plaintiff's attorney then asked Dr. Golub the following questions:

Q. Doctor, how familiar are you with multiple chemical sensitivity?

A. I really don't have a lot of experience with that at all.

Q. Okay. . . . Are you familiar with Dr. Mark Cullen's 1987 definition of the disease?

A. Not specifically.

Q. Okay. Have you read any literature about the disease?

A. No.

Q. How frequently have you treated patients with the disease?

A. I have never treated anyone with this specific exposure.

(AR 112.)

VE James Parker also testified at the hearing. ALJ Sutker asked him to opine as to whether three hypothetical individuals would be able to perform any of Plaintiff's past work. The first hypothetical individual could occasionally lift and carry up to fifteen pounds and frequently lift and carry up to ten pounds; could stand and walk a total of four hours out of an eight-hour day, and sit without limitations; could not climb ladders, ropes, or scaffolds, and could occasionally crawl, kneel and crouch; would have to avoid unprotected heights and temperature extremes, both hot and cold; and would need an indoor environment in which she could avoid concentrated exposure to dust, fumes, odors, gases, and other pulmonary irritants. The VE testified that such an individual could perform Plaintiff's past work as a biological technician, "just not as it was performed because that was primarily out of doors, and it involved more standing and walking, as well as exposure to irritants[.]" (AR 117.) The VE also testified that there are other substantial gainful activities that such an individual could perform, in positions such as "information clerk," "procurement clerk," and "receptionist[.]" (AR 117-18.)

15

The ALJ asked the VE about a second hypothetical individual with all the same physical restrictions, who would additionally be limited to uncomplicated tasks, defined as tasks that could be learned in thirty days or less. The second hypothetical individual could concentrate and focus on tasks for two hours at a time. The VE responded that such an individual could not perform any of Plaintiff's past work, or anything other than unskilled work. Examples of available unskilled positions were "inspection table worker," and "final assembler [of] . . . optical goods." (AR 119.) The VE also described a "production inspecting position[,]" but noted that position would involve exposure to irritants. *Id.*

For the third hypothetical individual, the ALJ described the same physical limitations as in the first example, with the additional assumption that the individual would have to avoid cigarette smoke, perfume, soldering fluxes, solvents, cleaners, fumes, odors, gases, and other chemicals. The VE testified that he "could not identify any work" available for such an individual. (AR 120.)

## III. ALJ Sutker's June 1, 2017 Decision.

In order to receive disability benefits under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential framework determines whether a claimant is disabled:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.

§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step

framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shifts to the Commissioner to show there is other work that the claimant can perform." *McIntyre*, 758 F.3d at 150 (internal brackets and quotation marks omitted).

On June 1, 2017, ALJ Sutker denied Plaintiff's application for benefits, finding that she was not disabled. In so ruling, she determined that Plaintiff had not engaged in substantial gainful activity since June 29, 2013. At Step Two, she found that Plaintiff suffered from the following severe impairments: "multiple chemical sensitivity status post exposure to pesticides/herbicides, degenerative joint disease knee, adjustment disorder and [ADHD.]" (AR 18.) At Step Three, ALJ Sutker concluded that none of Plaintiff's impairments, either independently or collectively, met or exceeded the severity of a Listing.

At Step Four, noting that Plaintiff was "diagnosed with multiple chemical sensitivity status post exposure to pesticides/herbicides, degenerative joint disease knee, adjustment disorder and ADHD, which result in functional limitations" and considering "both the objective findings and some of the [Plaintiff's] subjective complaints," (AR 25) the ALJ determined that Plaintiff had the RFC to:

occasionally lift and carry up to fifteen pounds and frequently lift and carry up to ten pounds. The [Plaintiff] can stand and . . . walk a total of four hours out of an eight-hour day and sit without limitations. The [Plaintiff] could not climb ladders, ropes or scaffolds. She could occasionally crawl, kneel and crouch. The individual would have to avoid unprotected heights and temperature extremes, both hot and cold. The [Plaintiff] would need an indoor environment and would have to avoid concentrated exposure to dust, fumes, odors, gases and other pulmonary irritants in the indoor environment. The [Plaintiff] would be limited to uncomplicated tasks, defined as tasks that typically can be learned in 30 days or less. The [Plaintiff] could concentrate, persist at task[s] and stay on pace for two-hour blocks of time throughout the work day, consistent with regularly scheduled breaks and lunch.

*Id.*

At Step Five, the ALJ concluded that Plaintiff was unable to perform any past relevant work, but could perform the requirements of representative sedentary, unskilled

occupations such as "inspection table worker[,]" "final assembler [of] optical goods[,]" and "production inspector[.]" (AR 26.) For this reason, ALJ Sutker found that Plaintiff was not disabled from June 29, 2013 to June 30, 2015, her date last insured.

## IV.    Conclusions of Law and Analysis.

### A.    Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149. "It is the function of the Secretary, not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (internal brackets and quotation marks omitted).

"If there is substantial evidence to support the [the ALJ's] determination, it must be upheld." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits us to glean the rationale of an ALJ's decision.'" *Cichocki*, 729 F.3d at 178 n.3 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)); *see also Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983) (noting that an ALJ need not "reconcile explicitly every conflicting shred of medical testimony"). An ALJ must consider "all evidence" in the record before making a determination as to whether a claimant is eligible for benefits. 20 C.F.R. § 416.920(a)(3). Remand is therefore warranted "when it appears that the ALJ has failed to consider relevant and probative

evidence which is available to him." *Lopez v. Sec'y of Dep't of Health & Human Servs.*, 728 F.2d 148, 150-51 (2d Cir. 1984).

## B. Whether the ALJ Erred in Relying on Dr. Golub's Opinion.

Plaintiff contends that the ALJ erred in relying upon Dr. Golub's opinion regarding the severity of her MCS because it was inconsistent with the opinions of Plaintiff's treating providers. Plaintiff further points out that Dr. Golub acknowledged that he did not have experience treating patients with MCS. The Commissioner responds that the ALJ properly considered Dr. Golub's opinion and relied upon it to determine Plaintiff's RFC and that Plaintiff's treating physicians similarly lacked expertise with MCS.

In deciding to accord "significant weight" to Dr. Golub's opinion, the ALJ acknowledged that "[g]enerally, the opinion of a non-examining source is entitled to less weight than the opinion of a treating or examining source." (AR 23.) She further noted that Dr. Golub, like Plaintiff's treating physicians, had no special expertise related to MCS but nonetheless found:

> In this case specifically, Dr. Golub is an internal medicine specialist, he has an awareness of all of the evidence in the record, and he has an understanding of social security disability programs and evidentiary requirements. Most importantly, his opinion regarding the claimant's functional limitations is highly persuasive because it is well-supported by the objective medical evidence already discussed in this decision.

(AR 23-24.) "[T]he opinions of nonexamining sources [may] override treating sources' opinions, provided they are supported by evidence in the record." *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993).

Plaintiff asserts that ALJ Sutker's opinion is internally inconsistent and in conflict with Dr. Golub's opinion because the ALJ noted that MCS is both "a disputed medical condition" and a "medically determinable impairment" (AR 24). The ALJ's findings are not mutually exclusive: at Step Two, she found that Plaintiff's MCS was a severe medically determinable impairment while acknowledging the controversy surrounding the diagnosis and the lack of objective evidence supporting it in Plaintiff's case.

Although Plaintiff is correct that Dr. Golub was not familiar with Dr. Mark Cullen's definition of MCS, there is no evidence that Dr. Cullen's 1987 criteria are authoritative.

Plaintiff further contends that ALJ Sutker's decision is not supported by substantial evidence because Dr. Golub had "no apparent knowledge about the medical condition at issue." (Doc. 6 at 7.) The Commissioner's Program Operations Manual Systems ("POMS") for "environmental illness[,]" which Plaintiff concedes applies to her condition, provides that:

> The principal clinical ecology procedure in diagnosing sensitivity to a chemical or food is the provocation-neutralization technique, in which the patient records symptoms occurring during a 10-minute period immediately following the administration of a test dose of a chemical, food extract, or allergen applied either as a sublingual drop or by subcutaneous or intracutaneous injection. Symptoms are "neutralized" by injecting or applying sublingually a lower dose of the same test substance. The results are based solely on the subjective report of symptoms by the patient.

> In claims alleging disability due to environmental illness, it is often difficult to identify abnormal signs and laboratory findings which can be associated with the alleged symptoms. Therefore, in evaluating claims based on environmental illness, all of the claimant's symptoms, signs, and laboratory findings must be considered to determine if there is a medically determinable impairment and the impact of any impairment on the claimant's ability to work. This evaluation should be made on an individual case-by-case basis to determine if the impairment prevents substantial gainful activity.

POMS DI 24515.064.[7]

In this case, the evidence of Plaintiff's condition consists primarily of self-reported symptoms as opposed to the results of a controlled diagnostic procedure like the one

---

[7] Plaintiff also asserts that Dr. Golub's opinion that she should avoid "cold, heat, fumes and other pulmonary irritants that involve outdoor herbicidal treatments" (AR 23) is inconsistent with POMS 24515.064, which states that "environmental medicine . . . ascribes a wide range of symptoms to exposure to numerous common substances in the environment." While exposure to a common substance, like herbicide or insecticide, may be associated with symptoms, POMS does not state that individuals with this condition are sensitive to *all* potential triggers from any source as a result of an initial environmental exposure.

20

described in POMS. Although this is not dispositive, the ALJ did not err in finding it relevant.

Dr. Golub reviewed Plaintiff's medical records, which indicate Plaintiff sought treatment relatively infrequently between 2012 and 2016 and that when she began to treat with Dr. D'Amato, she saw her only approximately twice per year.[8] The medical records do not contain laboratory findings or clinical observations by Plaintiff's physicians to support the conclusion that Plaintiff's MCS was disabling. For example, Dr. Trost, an endocrinologist who treated Plaintiff during the summer of 2012 recorded that Plaintiff reported no symptoms other than fatigue which had improved by the end of the summer and did not complain of environmental exposures. *See Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (holding that Appeals Council gave good reason for finding claimant not disabled where subjective reports of pain were not supported by medical evidence of impairment); *see also Jones v. Shalala*, 900 F. Supp. 663, 669 (S.D.N.Y. 1995) (affirming ALJ's reliance on opinions of consulting physicians that conflicted with treating physician's opinion because lack of "objective symptoms supporting [claimant's] subjective complaints of pain" constituted medical evidence to support consultants' opinions). Similarly, Mr. Archdeacon, although not an acceptable medical source, saw Plaintiff twice during the relevant time period and four times thereafter and noted no complaints of environmental triggers or exposures.

On balance, ALJ Sutker's decision reflects an appropriate analysis of Dr. Golub's opinion and her determination to accord it significant weight was supported by substantial evidence in the record and was not legal error. *See Banks v. Astrue*, 955 F. Supp. 2d 178, 188 (W.D.N.Y. 2013) ("It is within the province of the ALJ to weigh conflicting evidence in the record and credit that which is more persuasive and consistent with the record as a whole.").

---

[8] Some of the records Plaintiff cites to support her assertion that Dr. Golub's opinion was contradicted by medical evidence are from 2010 and 2011. Because it was previously determined that Plaintiff was not disabled during that time period, those records do not provide significant support for a finding of disability during the time period at issue here.

21

## C.    Whether the ALJ Failed to Properly Evaluate the Opinions of Treating Drs. D'Amato and Psonak.

Plaintiff argues that ALJ Sutker failed to provide "good reasons" for assigning less than controlling weight to the opinions of her treating osteopathic physicians, Drs. D'Amato and Psonak.  The Commissioner responds that the ALJ provided ample grounds for discounting these opinions and weighed them appropriately.

Under the treating physician rule, the ALJ first must decide "whether the opinion is entitled to controlling weight." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).  A treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record[.]" 20 C.F.R. § 404.1527(c)(2).  "Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it." *Estrella*, 925 F.3d at 95.  In so doing, the ALJ must "explicitly consider" the following non-exclusive factors identified in *Burgess*, 537 F.3d at 129: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (alteration in original).  "At both steps, the ALJ must give good reasons in its notice of determination or decision for the weight it gives the treating source's medical opinion." *Id.* at 96 (internal brackets and quotation marks omitted).

"An ALJ's failure to 'explicitly' apply the *Burgess* factors . . . is a procedural error[,]" *id.* (citation omitted), however, "a slavish recitation of each and every factor . . . is unnecessary where the ALJ's reasoning and adherence to the regulation are clear[.]" *Rivera v. Comm'r of Soc. Sec.*, 394 F. Supp. 3d 486, 494 (S.D.N.Y. 2019) (internal quotation marks and citation omitted); *see also Estrella*, 925 F.3d at 96 (holding that where an ALJ fails to sufficiently address the *Burgess* factors, the court must determine whether the decision "otherwise provides good reasons" for the weight given to a treating physician's opinion).

### 1. Dr. D'Amato.

In evaluating Dr. D'Amato's medical opinions, ALJ Sutker stated that she had considered the RFC Questionnaire that Dr. D'Amato completed on December 22, 2015 and had assigned it "lesser weight" because "[a]lthough Dr. D'Amato has treated the claimant for approximately two years, her opinion is based upon the claimant's self-report, rather than observations of the treating source and/or objective findings or objective observations." (AR 25.)[9] ALJ Sutker also noted that Dr. Golub disagreed with Dr. D'Amato's opinion as to how much work Plaintiff would likely miss due to her MCS. Plaintiff argues that these are not good reasons to give Dr. D'Amato's opinion less than controlling weight.

The SSA regulations provide that "[i]f . . . a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record, [the SSA] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2). If a treating physician's opinion is not entitled to controlling weight, the weight the opinion deserves is determined based on the length, nature, and extent of the treatment relationship; the frequency of examinations; the supportability and consistency of the opinion with the record as a whole; the physician's area of specialty; and other factors that "tend to support or contradict the medical opinion." *Id.* at § 404.1527(c)(2)-(6).

A treating physician's opinion is entitled to controlling weight only where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques[.]" *Estrella*, 925 F.3d at 95. Plaintiff's medical records reflect almost exclusively self-

---

[9] Dr. D'Amato's response to the questionnaire indicates it was based on "clinical findings" but her treatment notes do not reflect those findings.

reported symptoms.[10]  Acknowledging that the record lacks objective medical evidence that her symptoms were disabling, Plaintiff asserts that the ALJ was still bound to accept Dr. D'Amato's opinion as controlling because "MCS, like fibromyalgia, is a condition that does not have a lot of objective findings." (Doc. 6 at 9.) This analogy is unavailing. Although "there are no objective tests which can conclusively confirm" a diagnosis of fibromyalgia, *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003), objective medical evidence supports such a diagnosis where a clinician identifies "at least 11 of the 18 . . . tender points" specified by American College of Rheumatology guidelines. *Id.* at 107. For MCS, POMS outlines a diagnostic procedure that can be used to test for triggers in a controlled environment. Plaintiff's treating physicians did not use this procedure to evaluate her condition, nor did they note their objective clinical findings in their examinations.

ALJ Sutker further noted that Plaintiff travelled to a family wedding in November 2013 without major issues and to San Francisco as well. She considered Plaintiff's reports that tri-salts and grapefruit seed extract helped control her symptoms when she encountered a chemical exposure and that notwithstanding her complaints of poor concentration, she had a "stellar" performance on the Mini-Mental Health Status examination and demonstrated virtually no cognitive impairment. (AR 521.)

Dr. D'Amato's examination notes do not reflect observations of confusion, muscle twitching, muscle weakness, loss of coordination, tremors, heart palpitations, visual issues, and nasal irritation, notwithstanding that those symptoms are objectively verifiable and could be expected to manifest themselves over a two-year period. Dr. D'Amato's treatment notes instead document normal physical examination results in an

---

[10] *See Johnson v. Comm'r of Soc. Sec.*, 669 F. App'x 580, 581 (2d Cir. 2016) (summary order) (noting ALJ properly considered that physician's opinion "relied primarily on [claimant's] self-reported symptoms" in assigning weight); *Polynice v. Colvin*, 576 F. App'x 28, 31 (2d Cir. 2014) (summary order) (affirming ALJ's decision not to give controlling weight to treating source's opinion where "much of" that opinion "was no more than a doctor's recording of [claimant's] own reports of pain); *Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (summary order) (affirming ALJ's decision to give less weight to treating physician's opinion that was inconsistent with his own prior opinions and based on claimant's subjective reports).

office environment. Notwithstanding Plaintiff's conclusory assertion that this conflict "is not a sufficient reason to dismiss Dr. D'Amato's opinion" (Doc. 6 at 9), the ALJ is entitled to weigh the evidence and determine credibility. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (observing that it was "within the province of the ALJ to resolve" conflict in evidence by crediting consulting physician's opinion and affording little weight to opinion of treating physician unsupported by objective medical evidence).

### 2. Dr. Psonak.

The ALJ considered Dr. Psonak's opinions and offered the following assessment:

The undersigned is not persuaded by Dr. Psonak's opinion, as it is conclusory in nature, fails to give disabling limitations and is an assessment of the claimant's ability to engage in basic work[-]like activities, which is an opinion reserved to the Commissioner. Accordingly, the undersigned does not assign it the controlling weight ordinarily assigned to a treating physician's report commenting on the claimant's abilities[.] . . . Nevertheless, Dr. Psonak's observations and findings are not ignored and have been carefully considered in providing insight as to functional ability and how they affect the claimant's ability to work[.]

(AR 24.)

Plaintiff argues that Dr. Psonak's opinion is neither conclusory nor reaches issues reserved for the Commissioner because it addresses only Plaintiff's functional capacity. Plaintiff further asserts that Dr. Psonak's opinion is consistent with Dr. D'Amato's assessment of Plaintiff's disability as well as other medical evidence in the record.

As the Commissioner points out, Dr. Psonak treated Plaintiff at Chelation Medical Center, LLC from November 2010 through May 2011, prior to Plaintiff's alleged onset date of June 29, 2013 and during a time period for which Plaintiff has been adjudicated not disabled. There are no treatment records for Dr. Psonak attributable to the relevant period. *See Claymore v. Astrue*, 519 F. App'x 36, 38 (2d Cir. 2013) (finding that ALJ did not err in weighing opinions of claimant's treating physicians where several proffered opinions were outside the relevant period).

The treating physician rule does not require an ALJ to give deference to issues reserved for the Commissioner's judgment such as whether a claimant is "disabled and

cannot work." *Snell*, 177 F.3d at 133; 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). ALJ
Sutker therefore did not err in according Dr. Psonak's opinion of the degree of Plaintiff's
disability less than controlling weight. *See Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir.
2015) (affirming district court's finding that treating physician's conclusion of disability
was not entitled to weight because the issue was reserved for the Commissioner); *see also
Blackwood v. Comm'r of Soc. Sec.*, 2008 WL 2704352, at *8 (N.D.N.Y. July 2, 2008)
(finding ALJ was not obligated to give controlling weight to treating physicians' opinions
regarding claimant's "degree of disability as the decision whether a claimant is disabled
is reserved to the Commissioner"). In addition, the ALJ properly considered Dr.
Psonak's observations and findings to assess Plaintiff's functional capacity without
accepting his "*post hoc* . . . opinion [that Plaintiff had an average disability level of 75
percent] ostensibly based on [those] observations." *Monroe v. Comm'r of Soc. Sec.*, 676
F. App'x 5, 9 (2d Cir. 2017) (summary order); *see also* 20 C.F.R. § 1527(d)(2) (holding
that determination of a claimant's residual functional capacity "is reserved to the
Commissioner").

Plaintiff asserts that Dr. Psonak and Dr. D'Amato provided consistent opinions
regarding Plaintiff's ability to function outside her home. Neither of them, however, is a
specialist in MCS, and neither of them referred her to a specialist but rather they both
treated her symptoms with over-the-counter remedies. Against this backdrop, the ALJ
properly found the treating physicians' opinions were not supported by the relevant
medical evidence, provided good reasons for according those opinions less than
controlling weight, and the "substance of the treating physician rule was not traversed."
*Estrella*, 925 F.3d at 96 (citation omitted).

**D.      Whether Remand Is Warranted.**

Remand for the calculation of benefits is appropriate in cases where "the records
provided persuasive evidence of total disability that rendered any further proceedings
pointless." *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999); *see also Vargas v. Sullivan*,
898 F.2d 293, 296 (2d Cir. 1990) (remanding for calculation of benefits where there was

an "infinitesimal likelihood that employment of any kind would be available" to claimant). In this case, the court cannot make that finding.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for an order reversing the Commissioner's decision (Doc. 6) is DENIED and the Commissioner's motion to affirm (Doc. 7) is GRANTED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 20th day of November, 2019.

Christina Reiss, District Judge
United States District Court